ESTATE OF LOUISE S. MONROE, DECEASED, ROBERT J. MONROE, PROVISIONAL ADMINISTRATOR, AND ESTATE OF J. EDGAR MONROE, EXECUTOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9819–93.    Filed March 27, 1995.

*Michael E. Guarisco, Paul D. Rees,* and *Donald H. McDaniel,* for petitioner.

*Linda K. West,* for respondent.

COHEN, *Judge:* Respondent determined a deficiency of $3,652,947.52 in petitioner's Federal estate tax and an addition to tax of $2,739,710.64 under section 6663. In the alternative, respondent determined that petitioner is liable for the addition to tax under section 6662. After trial, respondent conceded that petitioner is not liable for a section 6663 addition to tax. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect as of the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issues for decision are:

(1) Whether documents executed by 29 legatees of petitioner constitute qualified disclaimers under section 2518;

(2) whether generation-skipping transfer taxes on testamentary direct skips should be charged to the property constituting the direct skips or to the residuum of decedent's estate; and

(3) whether petitioner is liable for the addition to tax under section 6662.

Use of the terms "disclaimer" and "gift" throughout this opinion is for convenience and is without indication of legal effect, except when connected to the language of the applicable statute.

## FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference.

Louise S. Monroe (decedent), a resident of New Orleans, Louisiana, died on April 28, 1989. Decedent was survived by her husband, J. Edgar Monroe (Monroe), also a resident of New Orleans. The couple had no children or descendants.

Decedent's will named Monroe as the executor of her estate. Monroe timely filed an estate tax return for petitioner on March 23, 1990. Monroe died on May 6, 1992, prior to the filing of the petition in this case.

During their marriage, decedent and Monroe accumulated a large estate. At the time of her death, decedent's one-half interest in the couple's community estate was valued at $9,796,429. Monroe was 92 years old at the time of his wife's death. He sought the assistance of his nephew, Robert Monroe (the nephew), in the administration of decedent's estate. The nephew served in the capacity of provisional administrator for petitioner.

In her will, decedent made three specific bequests, in trust, of U.S. Treasury bonds, each with a face value of $500,000. Decedent named two grandnieces, including Kathleen Gooden Hayward (Hayward), and one grandnephew as the income beneficiaries of the trusts. The children of the three income beneficiaries were named as the remainder beneficiaries of the respective trusts. Decedent's will directed that "all federal estate taxes, state and City inheritance or estate transfer taxes or other death taxes" attributable to the foregoing bequests be paid from the residuum of decedent's estate.

Decedent also made specific cash bequests in her will to 31 individuals and to four corporate entities. The following were among the specific cash bequests: $5,000 to Marilyn Monroe Wolf (Wolf), a niece of decedent; $5,000 to Elizabeth Monroe Richardson (Richardson), also a niece of decedent; $5,000 to Helene de la Houssaye Tebo (Tebo), a friend of decedent; and $50,000 to Lawrence Lee (Lee), a household employee of decedent. To Lee and to other legatees who were household employees, decedent also left an amount of cash equal to the annual salary that each employee was receiving at the time of decedent's death.

With respect to the specific cash bequests, decedent's will provided that "each of the particular legacies * * * set forth (other than those not liable for any of such taxes) shall bear its proportionate part of all death taxes that may be attributable thereto." Decedent left the remainder of her estate to her surviving spouse, Monroe. The remainder of her estate was to include any lapsed or renounced particular legacies.

Monroe retained the accounting firm of Touche Ross to serve as petitioner's accountants. Monroe's and the nephew's primary contacts at Touche Ross regarding the preparation of petitioner's estate tax return and post mortem tax planning were with Laura Pebbles (Pebbles) and David J. Bourg (Bourg).

Pebbles reviewed decedent's will and made initial projections of petitioner's Federal estate tax and State and local death tax liabilities. Her projections also included the calculation of projected generation-skipping transfer taxes. Pebbles reported these projections to the nephew, who subsequently discussed them with Monroe. Monroe was upset by the tax effect of the particular legacies. Pebbles and the nephew proceeded to run a computer-based tax projection based on the assumption that the nephew disclaimed his specific bequest from petitioner of $5,000, and they noted that the amount of tax due decreased significantly.

Monroe and the nephew thereafter concluded that the use of disclaimers would be an effective post mortem estate planning tool to decrease Federal estate and generation-skipping transfer taxes. With the guidance of petitioner's accountants, Monroe and the nephew identified 29 legatees whom they would ask to renounce their bequests. These legatees included Hayward, Wolf, Richardson, and 13 additional relatives; Tebo and three other close friends; eight household employees, including Lee; and one corporate legatee. Before deciding to request disclaimers from these legatees, Monroe sought the assurance of petitioner's accountants that he could continue to make inter vivos gifts to these legatees and make bequests in his will to them if he chose to do so. Monroe was told by the accountants that a disclaimer by a legatee did not preclude his ability to give or donate money to these individuals.

After Monroe and the nephew decided to request disclaimers from the 29 identified legatees, petitioner's accountants

advised the nephew that, to have a valid disclaimer for Federal estate tax purposes, the person renouncing could not receive or be promised any benefit for renouncing. The nephew explained this requirement to Monroe. The nephew then rehearsed with Bourg a presentation to make to the legatees when asking them to renounce their respective bequests.

The nephew's rehearsed presentation included the following general points: Monroe was upset over the high rate of taxes being imposed upon petitioner and the legatees; each legatee's bequest would be reduced significantly by estate and other taxes, which was not what decedent had intended; Monroe would like each legatee to disclaim the bequest; by disclaiming, each legatee would be giving up a right; and any disclaimer had to be totally voluntary and without consideration.

Monroe personally asked Hayward and four household employees to renounce their respective bequests. At the request of Monroe, the nephew contacted the remaining 24 legatees concerning disclaimers. Each legatee who was asked to disclaim renounced the bequest by signing a document of renunciation. These documents constituted valid disclaimers under Louisiana law. Each document was substantially similar and stated the following:

appearer has not accepted the aforesaid legacy left to appearer by said decedent, nor has appearer received any benefits from decedent's estate and hereby refuses to accept and does hereby expressly, irrevocably, publicly, unqualifiedly and formally renounce and disclaim any and all interests that appearer has or may have in the aforesaid legacy left to appearer by the said decedent. * * *

The total amount disclaimed was $892,781. Petitioner included this amount in the marital deduction for its Federal estate tax return as property passing to Monroe.

There was no single motive that prompted all of the legatees to disclaim their bequests. Some of the disclaimants were told by the nephew that Monroe had always taken care of them and had never cheated them or that Monroe was a generous man. Many of the disclaimants anticipated that Monroe would continue to care for them financially or was likely to make a bequest to them in his will. Some disclaimants believed that executing the disclaimer would be

in their best long-term interest, because they did not wish to upset Monroe by refusing to renounce.

Richardson had an ill daughter and was concerned that her daughter's health insurance policy would not cover all of her daughter's anticipated medical expenses. She agreed to renounce her bequest because she did not wish to irritate Monroe in case she needed financial support from him for her daughter's health expenses. Wolf disclaimed her bequest because she did not want to be removed from Monroe's will.

Tebo had been upset by an incident in which decedent had indicated anger with her approximately 1 year before decedent's death. Decedent had later sent a note of apology, but Tebo was concerned that the bequest was an added apology. She told the nephew that she could not accept the bequest before he suggested that she renounce it.

Hayward renounced her income interest in the $500,000 face value bond trust on December 28, 1989. Hayward received a personal check dated January 11, 1990, in the amount of $500,000, bearing the notation "gift" and signed by Monroe. All of the 27 individual disclaimants and the one corporate disclaimant received personal checks signed by Monroe, bearing the notation "gift" in amounts approximately equal to or exceeding the gross amounts of their respective renounced bequests. Each of the disclaimants had signed a document of renunciation during December 1989. Monroe sent the aforementioned checks to these disclaimants in late December 1989 and in January 1990. Tebo received one check at Christmas and another in January. Not one of the disclaimants refused to accept the check or checks sent by Monroe. Tebo initially wanted to refuse the checks but was persuaded by a friend not to return them.

Pebbles and Bourg did not become aware of Monroe's payments to the disclaimants until February 7, 1991. Petitioner's accountants prepared, and Monroe timely filed on April 18, 1991, a gift (and generation-skipping transfer) tax return for 1990. The 1989 gift (and generation-skipping transfer) tax return was prepared in the fall of 1991 and was filed late on December 30, 1991.

In the notice of deficiency, respondent disallowed in full the marital deduction that was claimed by petitioner in its estate tax return. Respondent reduced the marital deduction by the 29 disclaimers, which respondent determined were

invalid. Additionally, respondent reduced the marital deduction by generation-skipping transfer taxes associated with decedent's three in-trust bequests that respondent determined were to be charged to the residuum of decedent's estate and not to the particular bequests.

## OPINION

### *Qualified Disclaimers*

Petitioner contends that it is entitled to a marital deduction for the value of the property that passed to Monroe as a result of the disclaimers made by 29 of its legatees. Section 2056(a) allows a marital deduction from a decedent's gross estate for the value of property interests passing from the decedent to a surviving spouse. Section 20.2056(d)–1(b), Estate Tax Regs., provides that, when property passes from a decedent to a person other than the surviving spouse and that person makes a qualified disclaimer that results in the surviving spouse's being entitled to such property, the disclaimed interest is treated as passing directly from the decedent to the surviving spouse.

In order for the amounts that were disclaimed by 29 of decedent's legatees to be treated as passing directly to Monroe and, thus, qualifying for the marital deduction from decedent's gross estate, the disclaimers must be "qualified disclaimers" as defined in section 2518. Although section 2518 is a gift tax provision, section 2046 makes it applicable for estate tax purposes as well. Section 2518(b) defines a "qualified disclaimer" as follows:

the term "qualified disclaimer" means an *irrevocable and unqualified* refusal by a person to accept an interest in property but only if—

(1) such refusal is in writing,

(2) such writing is received by the transferor of the interest, his legal representative, or the holder of the legal title to the property to which the interest relates not later than the date which is 9 months after the later of—

(A) the day on which the transfer creating the interest in such person is made, or

(B) the day on which such person attains age 21,

(3) *such person has not accepted the interest or any of its benefits,* and

(4) as a result of such refusal, the interest passes without any direction on the part of the person making the disclaimer and passes either—

(A) to the spouse of the decedent, or

(B) to a person other than the person making the disclaimer.
[Emphasis added.]

According to respondent, the disclaimers were not "irrevocable and unqualified" as required by section 2518(b), because the legatees accepted consideration in return for executing the disclaimers when they received the cash gifts from Monroe shortly after disclaiming. Petitioner contends that the disclaimers did constitute qualified disclaimers under section 2518 and, specifically, that the legatees did not accept consideration in return for making such disclaimers. In petitioner's view, the disclaimers and the subsequent gifts that were received by the disclaimants from Monroe were independent, unrelated transactions, because there was no agreement or promise between any legatee and Monroe or the nephew to exchange a disclaimer for consideration.

Section 25.2518–2(d)(1), Gift Tax Regs., sets forth an explanation of "acceptance" for purposes of section 2518(b)(3):

A qualified disclaimer cannot be made with respect to an interest in property *if the disclaimant has accepted the interest or any of its benefits, expressly or impliedly, prior to the disclaimer.* Acceptance is manifested by an affirmative act which is consistent with ownership of the interest in property. * * * In addition, the *acceptance of any consideration in return for making the disclaimer is an acceptance* of the benefits of the entire interest disclaimed. [Emphasis added.]

The dispute between the parties concerns whether or not the disclaiming legatees received consideration in return for making the disclaimers. Petitioner bears the burden of proof. Rule 142(a).

Petitioner maintains that section 25.2518–2(d)(1), Gift Tax Regs., sets forth two independent tests for determining when a legatee has accepted an interest in the property to be disclaimed. The first involves the actual acceptance of an interest in property to be disclaimed, prior to making the disclaimer. Petitioner concedes that such acceptance may be express or implied. The second test, according to petitioner, involves the exchange of a disclaimer for consideration. In petitioner's view, consideration cannot be implied. It must be

something identifiable, and it must have been agreed upon at the time the disclaimer was made.

Respondent disagrees with petitioner's characterization of the execution of the disclaimers and the receipt of the gifts as two separate, unrelated sets of transactions. Rather, respondent maintains that there was a single transaction: decedent left 29 legatees money, and the legatees claimed that they renounced the money, but, in substance, they accepted it. In respondent's view, if the Court were to accept petitioner's construction of section 2518(b)(3), the words "irrevocable and unqualified", as used in section 2518, would be rendered superfluous and nonexistent.

For a disclaimer to be "irrevocable and unqualified", as required by the language of section 2518, it must have substance. A disclaimer is not "irrevocable" if a legatee or heir formally disclaims but, in substance, receives his or her bequest. A disclaimer is not "unqualified" if a legatee or heir is induced or coerced into disclaiming his or her bequest as happened in this case. Here, the evidence suggests that, with the exception of Tebo, the disclaimants expected, for one reason or another, that they would receive their renounced bequests in the form of a gift or legacy from Monroe. Furthermore, the testimony of many of the disclaimants suggests that they feared what would happen if they refused to renounce their bequests.

Lee, a household employee of decedent and Monroe, testified about Monroe's request that Lee renounce his bequest of $50,000 and his annual salary of $10,000:

A Mr. Monroe [Monroe] came along later on and asked us [the household employees] to renounce it [the bequest], give it up.

\* \* \* \* \* \* \*

Q. What did he ask you?
A. He asked us to renounce, give it—turn it over to him.
Q. Did he say why?
A. No, I don't think. I can't remember exactly for what reason, other than to turn it over to him, and he would take care of it.
Q. *He would take care of you if you turned it over to him.*
A. Yes.
[Emphasis added.]

Richardson, decedent's niece with a sick daughter, described her reason for agreeing to renounce her bequest when asked to do so by the nephew:

Q. Why did you ultimately decide to sign the act of renunciation?
A. Because, like I said, I didn't know if I would need help for her [Richardson's daughter] later, and you just—you don't go against Edgar [Monroe] if you ever want anything from him.

Hayward, the disclaimant who renounced a $500,000 in-trust bequest testified in cross-examination at trial:

Q. Isn't it true that you told the agents [respondent] that you knew from the conversation with J. Edgar Monroe that you would get the inheritance money, if not shortly after renouncing the bequest, then in his will?
A. He [Monroe] didn't state that. I sort of certainly assumed that.

The foregoing testimony is representative of that of the majority of the disclaimants.

In requesting the disclaimers from the legatees, the nephew suggested to them that Monroe would take care of the legatees if they agreed to execute their respective disclaimers. The nephew's testimony during cross-examination demonstrates that he intended to buttress the legatees' confidence in Monroe's continued generosity:

Q. What has generosity got to do with disclaiming on the part of a person being disclaimed in favor of it?
A. It puts into perspective the fact that someone is asking you to do something and he's not promising you anything. He's not giving you anything, but at least you're identifying what type of person he is or was, anyway.

The nephew's testimony demonstrates that he intended to inform the disclaimants that the probability that they would receive something from Monroe in the future was good. Conversely, if the legatees refused to disclaim, they were unlikely to receive anything from Monroe subsequently, because their refusal would be against Monroe's wishes.

The regulations illustrate the acceptance of consideration in return for making a disclaimer with the following example:

B is the recipient of certain property devised to B under the will of A. The will stated that any disclaimed property was to pass to C. B and C entered into negotiations in which it was decided that B would disclaim all interest in the real property that was devised to B. *In exchange,* C promised to let

B live in the family home for life. B's disclaimer is not a qualified disclaimer for purposes of section 2518(a) because B accepted consideration for making the disclaimer. [Sec. 25.2518–2(d)(4), *Example* (2), Gift Tax Regs.; emphasis added.]

Petitioner argues that the use of the term "in exchange" in the regulations suggests that, for purposes of section 2518(b)(3), the term "consideration" is meant in its traditional sense and requires a bargained-for exchange. In other words, there must have been an explicit promise or agreement existing at the time the disclaimers were entered into for the disclaimers to be disqualified under section 2518(b)(3).

We addressed the issue of acceptance in *Estate of Thompson v. Commissioner,* 89 T.C. 619 (1987), revd. on other grounds 864 F.2d 1128 (4th Cir. 1989). In that case, the decedent left an income interest in a family farming operation to a nonqualified heir within the meaning of section 2032A(e)(1). The estate wished to elect the special use valuation under section 2032A but was unable to do so because of the interest passing to the nonqualified heir. The personal representative of the estate paid the nonqualified heir $18,000 in return for her agreeing to execute a disclaimer with respect to her income interest. We held that the disclaimer was not a qualified disclaimer, because the nonqualified heir had accepted consideration in return for renouncing her bequest. In its brief, petitioner cites *Estate of Thompson* as authority for the proposition that section 2518(b)(3) requires an explicit negotiation or bargained-for exchange to occur at the time the disclaimers are executed.

We disagree with petitioner's application of section 2518(b)(3) and the regulations thereunder to the facts here. Monroe and the nephew's statements to the disclaimants that Monroe would take care of "it" or take care of them if they agreed to renounce their bequests conveyed a clear message. All would be "taken care of" by Monroe if the legatees agreed to do as he wished; conversely, Monroe would be upset if a legatee refused to disclaim, and his care and generosity would no longer be forthcoming.

The plain language of section 2518 requires a disclaimer to be "irrevocable and unqualified". See *Caminetti v. United States,* 242 U.S. 470, 485 (1917) (stating that a court must accord first priority in statutory interpretation to the plain

meaning of the provision in question). This language is not insignificant, and petitioner has not persuaded us that the facts justify the marital deduction. See *Commissioner v. Jacobson,* 336 U.S. 28, 48–49 (1949) (exemptions from tax are narrowly construed); *United States v. Stewart,* 311 U.S. 60, 71 (1940) ("those who seek an exemption from a tax must rest it on more than a doubt or ambiguity"). The disclaimants may not have explicitly negotiated with or bargained with Monroe or the nephew for consideration in return for executing their disclaimers. Each of the disclaimants other than Tebo, however, was induced or, in some instances, coerced, into executing a disclaimer. Under these circumstances, the consideration for their disclaimers was the implied promise that they would be better off if they did what Monroe wanted them to do than if they refused to do so. Their disclaimers thus were not "unqualified" as required by section 2518.

Tebo is an exception because we are persuaded by her testimony that she voluntarily and without expectation of anything in return renounced her legacy for personal reasons. Further, we believe that she accepted Monroe's checks to avoid offending him.

In addition, petitioner has failed to persuade us that Monroe's cash gifts to the 29 disclaimants were merely part of a pattern of generosity that Monroe had engaged in throughout his life. These "gifts" were all cash payments of specific and substantial amounts made to the disclaimants shortly after they executed their disclaimers. The inference drawn from this targeted gift-giving is that Monroe made them "in return" for the disclaimants' renouncing their bequests and not from a "detached and disinterested generosity." Cf. *Commissioner v. Duberstein,* 363 U.S. 278, 285 (1960). Even if Monroe had no legal obligation to compensate the disclaimants, they anticipated, and received, payments from him that left them in the same economic position as if they had accepted the legacies in the first place. Cf. *United States v. Estate of Grace,* 395 U.S. 316, 324 (1969).

In sum, we hold that, with the exception of Tebo's renunciation of her $5,000 bequest, none of the renunciations constituted effective disclaimers under section 2518(b).

*Allocation of Generation-Skipping Transfer Tax*

Respondent reduced petitioner's marital deduction by generation-skipping transfer taxes associated with decedent's three in-trust bequests that respondent determined were to be charged to the residuum of decedent's estate rather than to the particular bequests. Petitioner contends that respondent's determination was in error because, under decedent's will, no portion of the generation-skipping transfer taxes was charged to the residuum of decedent's estate.

The generation-skipping transfer tax applies to various transfers, including "direct skips". Secs. 2601, 2611(a)(3). A direct skip is defined in section 2612(c) as any transfer of property, which is subject to Federal estate or Federal gift tax, to a "skip person". A skip person includes any natural person who is assigned to a generation that is two or more generations below the generation assignment of the transferor or a trust in which all the interests are held by skip persons. Sec. 2613(a). The parties agree that the three in-trust legacies in decedent's will were direct skips subject to generation-skipping transfer taxes. They disagree as to the proper allocation of these taxes.

If the generation-skipping transfer taxes are charged to the residuum of decedent's estate, the value of the residuum qualifying for the marital deduction is reduced by the amount of the generation-skipping transfer taxes. Sec. 2056(b)(4). Section 2056(b)(4) provides that, in determining the value of any interest in property passing to the surviving spouse, "there shall be taken into account the effect which the tax imposed by section 2001, or any estate, succession, legacy or inheritance tax, has on the net value to the surviving spouse of such interest".

The relevant provision for resolution of this issue is section 2603(b):

SEC. 2603(b). SOURCE OF TAX.—Unless otherwise directed pursuant to the governing instrument *by specific reference* to the tax imposed by this chapter [chapter 13], the tax imposed by this chapter on a generation-skipping transfer shall be charged to the property constituting such transfer. [Emphasis added.]

Petitioner argues that the foregoing provision requires that the generation-skipping transfer taxes associated with decedent's in-trust legacies are to be charged to those

bequests, because decedent's will did not direct that generation-skipping transfer taxes be charged to the residuum of her estate by making a "specific reference" to such taxes. Respondent maintains that decedent's failure to use the words "generation-skipping transfer tax" is not fatal to a determination that such taxes are chargeable to the residuum of decedent's estate, because it was decedent's intention that the tax burden of the bequests fall on the residuum.

With respect to the three in-trust legacies, decedent's will directed that "all federal estate taxes, state and City inheritance or estate transfer taxes, or other death taxes attributable to the bequests * * * shall be paid from the residuum of my estate." In contrast, decedent's will provided that the 31 particular legacies "each * * * shall bear its proportionate part of all death taxes that may be attributable thereto." Respondent contends that, in light of the contrasting treatment of the two types of legacies, decedent's will makes clear that decedent intended that the tax burden on the property in trust fall on the residual estate and that the tax burden on the particular bequests be borne proportionately by each bequest. In respondent's view, decedent's failure specifically to refer to generation-skipping transfer taxes is not controlling, because, in matters of will construction, the testator's intent controls. *Succession of Russell,* 590 So. 2d 606 (La. Ct. App. 1991). Respondent also maintains that the reference to "death taxes" in decedent's will may be interpreted as including generation-skipping transfer taxes.

Section 2603(b) requires that there be a "specific reference" to the generation-skipping transfer tax to prevent a charge to the property constituting the transfer. The words of the provision are unambiguous and should be accorded their ordinary and everyday meaning. *Malat v. Riddell,* 383 U.S. 569, 572 (1966). Decedent's reference to "death taxes" is not equivalent to a "specific reference" to the generation-skipping transfer tax. Section 2603(b) requires a will or other governing instrument to make specific reference to the tax "imposed by this chapter", namely, chapter 13, captioned Tax on Certain Generation-Skipping Transfers, whereas the provisions of the Federal estate tax are in a different chapter of the Code; i.e., chapter 11. There is no evidence of legislative purpose overriding the plain meaning of "specific reference",

and, thus, we hold that an explicit reference to generation-skipping transfer taxes is required by section 2603(b). See *Leckie Scholarship Fund v. Commissioner,* 87 T.C. 251, 260 (1986).

Respondent also argues that Louisiana law, not Federal law, governs the net interest in property passing to Monroe for purposes of the marital deduction and cites *Riggs v. Del Drago,* 317 U.S. 95 (1942), as authority. In that case, the Supreme Court held: "Congress intended that the *federal estate tax* should be paid out of the estate as a whole, and that the applicable state law as to the devolution of property at death should govern the distribution of the remainder and the ultimate impact of the federal tax". *Id.* at 97–98 (emphasis added). Respondent cites additional cases where State law governed the allocation of estate administrative expenses and Federal estate taxes. *Estate of Penny v. Commissioner,* 504 F.2d 37 (6th Cir. 1974), revg. and remanding 59 T.C. 102 (1972); *Estate of Allen v. Commissioner,* 101 T.C. 351 (1993); *Bulliard v. Bulliard,* 363 So. 2d 1343 (La. Ct. App. 1978). These cases are distinguishable, because, unlike the case at hand, there was no Federal statute directing how Federal estate taxes or administration expenses were to be apportioned.

Section 2603(b) governs the apportionment of generation-skipping transfer taxes in this case and requires that such taxes be imposed on the transferred property. The governing instrument does not provide otherwise with a specific reference to the generation-skipping transfer tax. Because the provision in decedent's will did not specifically refer to generation-skipping transfer taxes, taxes on the three in-trust legacies do not reduce the marital deduction.

## Negligence Penalty

Section 6662(a) imposes a penalty for the underpayment of tax in an amount equal to 20 percent of the underpayment. Respondent determined, in the alternative to the now-conceded addition to tax for fraud, that petitioner is liable for the accuracy-related penalty imposed by section 6662(a). Respondent asserts that the entire underpayment of petitioner's tax was due to negligence or intentional disregard of

rules or regulations. Sec. 6662(b)(1). Petitioner bears the burden of proof on this issue. Rule 142(a).

"Negligence" includes a failure to make a reasonable attempt to comply with the provisions of the internal revenue laws. Sec. 6662(c); sec. 1.6662–3(b)(1), Income Tax Regs. "Disregard" includes any careless, reckless, or intentional disregard of rules or regulations. Sec. 6662(c); sec. 1.6662–3(b)(2), Income Tax Regs.

The accuracy-related penalty does not apply with respect to any portion of an underpayment if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion. Sec. 6664(c)(1). The determination of whether a taxpayer acted with reasonable cause and in good faith depends upon the pertinent facts and circumstances. Sec. 1.6664–4(b)(1), Income Tax Regs.

Reliance on a qualified adviser will constitute reasonable cause only if the taxpayer has acted in good faith and has made full disclosure of all relevant facts to the adviser. *Paula Constr. Co. v. Commissioner,* 58 T.C. 1055, 1061 (1972), affd. 474 F.2d 1345 (5th Cir. 1973).

Petitioner contends that it acted with reasonable cause, because it relied upon the advice of its accountants for an understanding of the requirements for a qualified disclaimer under section 2518. Petitioner argues that it reasonably concluded that Monroe was free to give the disclaimants cash gifts equaling the amounts of their renounced bequests within weeks of the execution of the disclaimers.

Respondent maintains that petitioner may not rely on the advice of its accountants as a shield against the negligence penalty, because petitioner failed to disclose relevant information to the accountants. In respondent's view, petitioner did not rely on its accountants in good faith, because petitioner did not inform them of Monroe's cash gifts to the disclaimants equaling the renounced bequests.

We are not persuaded by petitioner's contention that, because the accountants told the nephew that Monroe could continue to make gifts or leave a bequest to the disclaimants, there was no reason to inform the accountants of these cash gifts by Monroe. Monroe's gift-giving was targeted only to those legatees who had disclaimed and was engaged in very shortly after the disclaimants had honored Monroe's request

that they renounce their bequests. The inference reasonably drawn from such gift-giving is that it was connected to the execution of the 29 disclaimers. The accountants should have been informed of these facts. We do not believe that petitioner acted in good faith reliance on the accountants.

Petitioner next contends that, regardless of whether it was entitled to rely on its accountants, the Court should not impose the negligence penalty because the deficiency was due to an honest difference of opinion as to whether the disclaimers were qualified under section 2518. The negligence penalty is inappropriate where an issue to be resolved by the Court is one of first impression involving unclear statutory language. *Braddock v. Commissioner,* 95 T.C. 639, 645 (1990); *Wiggins v. Commissioner,* 92 T.C. 869, 873 (1989), affd. 904 F.2d 311 (5th Cir. 1990). Here, however, our decision is based on an interpretation of the facts, which were well known to petitioner.

Furthermore, on brief, petitioner conceded that Monroe and the nephew were "entirely dependent upon the accountants for their understanding of the nature and utilization of disclaimers." Because petitioner failed to disclose the material fact of Monroe's essentially contemporaneous "gift-giving", the accountants were unable to provide a fully informed opinion on whether or not the disclaimers satisfied the requirements of section 2518. We hold that petitioner is liable for the addition to tax under section 6662.

To reflect the foregoing and the agreement of the parties,

*Decision will be entered under Rule 155.*