T.C. Memo. 1996-537


UNITED STATES TAX COURT


OLIVER E. STUBBLEFIELD, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 5422-95.                    Filed December 5, 1996.


Oliver E. Stubblefield, pro se.

<u>Nancy Graml</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


ARMEN, <u>Special Trial Judge</u>:  This case was assigned pursuant

to the provisions of section 7443A(b)(3) and Rules 180, 181, and

182.[1]

---

[1] Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for 1991, the taxable year in
issue, and all Rule references are to the Tax Court Rules of
(continued...)

For the taxable year 1991, respondent determined a deficiency in petitioner's Federal income tax in the amount of $3,385 and an accuracy-related penalty under section 6662(a) in the amount of $677.

The issues for decision are as follows:

(1) Whether petitioner failed to report self-employment income in the amount of $12,670;

(2) whether petitioner failed to report interest income in the amount of $526; and

(3) whether petitioner is liable for the accuracy-related penalty under section 6662(a).

The amount of petitioner's liability for self-employment tax and the amount of the deduction under section 164(f) to which petitioner is entitled are mechanical matters, the resolution of which will depend on our disposition of the first enumerated issue.

## FINDINGS OF FACT

Some of the facts have been stipulated, and they are so found. Petitioner resided in Houston, Texas, at the time that his petition was filed with the Court.

### Petitioner's Occupation

Petitioner is a licensed barber. He attended barber college in the late 1980's, some time after graduating from high school in 1985.

---

[1](...continued)
Practice and Procedure.

Petitioner worked as a barber throughout the year in issue. Although he utilized a barber shop owned by his father, petitioner was self-employed and not an employee of his father.

The barber shop where petitioner worked was open for business Tuesday through Saturday throughout the year, except on major holidays such as New Year's Day, when it was closed for business. Petitioner did not work when the barber shop was closed.

Petitioner, his father, and a cousin worked as barbers at the barber shop, which had 4 barber chairs.

Petitioner was generally paid in cash by his customers for his services at the barber shop. Petitioner pocketed some of the cash and deposited the balance in one of the bank accounts that he maintained with Channelview Bank. See _infra_ "Petitioner's Bank Accounts".

Petitioner's Enrollment at the University of Houston

Petitioner attended, but did not graduate from, the University of Houston, where he matriculated in 1987. For the spring semester of 1989 petitioner enrolled in 4 courses for a total of 13 credits, and for the fall semester of that same year he enrolled in 3 courses for a total of 10 credits. Following the spring semester of 1990, petitioner was placed on academic suspension. Petitioner did not return to the University of Houston until the fall semester of 1991, at which time he enrolled in 2 courses for a total of 7 credits. Following the

completion of this semester petitioner was again placed on academic suspension.

Petitioner's Bank Accounts

During the year in issue, petitioner maintained two bank accounts with Channelview Bank, formerly known as Port City Bank and now known as Prime Bank. One account was a checking account (acct. no. 53-162984-9) and the other account was a savings account (acct. no. 30-561183-0). Petitioner had sole signature authority over both the checking account and the savings account.[2]

The vast majority of the deposits made to petitioner's bank accounts were made in cash. One of the few checks that was deposited bears the notation "haircut" and was in the amount of $15. None of the checks deposited was drawn by either petitioner's sister Cynthia S. Bell or petitioner's cousin Sharon B. Williams Rawls.[3]

Petitioner's Credit Accounts

---

[2] The checking account was titled in the name of "Oliver E. Stubblefield" and the savings account was titled in the names of "L.D. Stubblefield or Oliver E. Stubblefield". L.D. Stubblefield is petitioner's father. The parties stipulated that petitioner had sole signature authority over both accounts.

[3] The only check having any relationship to either petitioner's sister or cousin is a check for tuition refund from Houston Community College in the amount of $135.10 that is made payable to petitioner's cousin.

Petitioner possessed an American Express card in 1991, but he rarely used it. Petitioner never had a monthly balance greater than $100.

Petitioner also possessed a Citibank MasterCard in 1991, but he made no charges to his account during the year. Petitioner began 1991 with a balance of $631.22, which he paid off during the course of the year. The record does not disclose what goods or services had been charged to give rise to such balance.

Petitioner also possessed a Discover card in 1991, but he used it only once during the year to make a single purchase in the amount of $23.70. Petitioner began 1991 with a balance of $447.26, which he paid off during the course of the year. The record does not disclose what goods or services had been charged to give rise to such balance.

Petitioner maintained an account with Foley's, a division of the May Department Stores Co., in 1991, but he made no charges to his account during the year. Petitioner began 1991 with a balance of $589.49, which he paid off during the course of the year. The record does not disclose what goods or services had been charged to give rise to such balance.

Petitioner maintained an account with McDuff's Appliances in 1991. Petitioner did not charge any purchases to his account with McDuff's in 1991 other than a projection screen television that cost approximately $2,000.

In September 1989, petitioner purchased a dresser, a mirror, and several other pieces of furniture and related hardware from Metropolitan Furniture Co., Inc. (Metropolitan) for a cash price of $1,157, exclusive of sales tax and delivery charge. Petitioner financed the purchase pursuant to a retail installment contract that obligated him to make monthly payments of approximately $58.50 for some 18 months, commencing November 1989.

In conjunction with the foregoing purchase of furniture, petitioner executed a credit application with Metropolitan. In the credit application, petitioner represented that his weekly "take-home" pay was $350, which he earned working at his father's barber shop as a "barber-stylist", a position that he had held for at least "1 yr. 9 mths".

In the credit application with Metropolitan, petitioner also represented that he owned a 1989 "Niessan" automobile that he was financing through "Niessan" Acceptance Corp. Petitioner represented that his monthly car payment was $385 and that the loan balance was $15,000.

In January 1991, petitioner purchased a sofa table and a cocktail table from Metropolitan for a cash price of $261, exclusive of sales tax. Petitioner financed the purchase pursuant to a retail installment contract that obligated him to make monthly payments for some 6 months, commencing February 1991.

In conjunction with the January 1991 purchase of furniture, petitioner confirmed at that time the financial data that he had previously provided to Metropolitan in September 1989, including the representation that his weekly "take-home" pay as a "barber-stylist" was $350.

Metropolitan grants credit to prospective customers, and among retailers in Houston it is one of the most liberal in granting credit. Metropolitan has granted credit to prospective customers with a bad credit history, including a history of repossessions, with a 50-percent downpayment.

Petitioner's Sister and Cousin

As previously indicated, petitioner has a sister by the name of Cynthia S. Bell (Ms. Bell) and a cousin by the name of Sharon B. Williams Rawls (Ms. Rawls).

During 1991, Ms. Rawls was employed by Methodist Hospital in Houston as a medical technician, a position that she had held for many years. Ms. Rawls has also held a variety of part-time positions over the years, including 1991.

Ms. Rawls filed an income tax return (Form 1040) for 1991. On her return, Ms. Rawls reported total income of $16,645, which amount consisted solely of wages from Methodist Hospital.

Details concerning Ms. Bell's income and employment, if any, are not disclosed in the record.

Petitioner's Income-producing Activities in 1988 and 1990

Petitioner earned approximately $2,900 in 1988 working as an employee for Amoco and Tenneco, which amount he reported on an income tax return for that year. Petitioner did not report income from any other source for that year.

Petitioner filed an income tax return for 1990 and reported thereon approximately the same amount of income that he reported on his income tax return for 1991. See infra, next topic.

Petitioner's Income Tax Return for 1991

Petitioner filed an income tax return (Form 1040) for 1991, the taxable year in issue. On his return, petitioner reported total income of $4,150. This amount consisted of interest income of $100 and business income of $4,050. On his return, petitioner identified his occupation as "barber".

Petitioner attached a Schedule C (Profit or Loss From Business) to his 1991 return. On the Schedule C, petitioner reported gross receipts of $4,500, total expenses of $450, and net profit of $4,050. On his Schedule C, petitioner identified his principal business as "haircutting".

Petitioner reported "zero" taxable income, and therefore no "regular" income tax under section 1, on his 1991 return. He did report self-employment tax under section 1401 based on the net profit disclosed on his Schedule C.[4]

---

[4] Although petitioner reported "zero" taxable income, his return actually disclosed a loss of $1,400. Because petitioner did not claim any deduction under sec. 164(f) for one-half of his
(continued...)

## Respondent's Examination of Petitioner's 1991 Return

Respondent's examination of petitioner's 1991 income tax return began in 1993.

During the course of the examination, petitioner represented that he maintained a wall calendar at the barber shop that he used to keep track of appointments and to record income, but that the current month of the calendar was not retained after month's end.

During the course of the examination, petitioner also represented that he maintained a small, red, spiral notebook in which he contemporaneously summarized his income on a daily basis. Petitioner produced the notebook for the examining agent and, at trial, introduced 3 pages from it (petitioner's exhibit).

Petitioner's exhibit indicates that petitioner worked throughout 1991 on Tuesdays, Wednesdays, and Fridays, but never on any other day of the week. It also indicates that for the first 11 months of the year, petitioner worked every Tuesday, every Wednesday, and every Friday, except for Friday, November 22, 1991. For that date, the word "off" appears immediately above what appears to be a dollar entry, which has been

---

[4](...continued)
reported self-employment tax, petitioner's return essentially disclosed a loss of $1,686; i.e., $1,400 + 1/2($572). In revising petitioner's taxable income for deficiency purposes, respondent reduced the aggregate amount of adjustments made to petitioner's income in the notice of deficiency by the $1,686 loss.

obliterated and not included in the total for that week.  For the month of December, dashes appear for the dates on which petitioner did not work.

The entries on petitioner's exhibit are made in red, green, blue, and black ink, as well as in pencil.  Generally, a series of entries are made in the same color ink or in pencil; thereafter, another series of entries appear in another color ink or in pencil.  A few strike-overs also appear.

For the month of January 1991, petitioner's exhibit reads as follows:

```
        Jan 91
                  T      WED     FRI     TOT
        2-5       25      21      32      79 [sic]
        9-12      27      33      25      85
        16-19     28      30      21      79
        23-26     26      31      20      77
        29-30-1   25      25      32      82
                                         402
```

The first Tuesday in January 1991 was not January 2, but rather January 1, New Year's Day.  The Tuesday-Friday dates for the first 4 weeks of January 1991 were not January 2-5, January 9-12, January 16-19, and January 23-26, but rather January 1-4, January 8-11, January 15-18, and January 22-25.

The monthly totals on petitioner's exhibit amount to $4,584.

During the course of the examination, petitioner stated that he received no gifts or loans in 1991.

Respondent's Deficiency Determination

Respondent determined that petitioner failed to report (1) self-employment income in the amount of $12,670 and (2) interest income in the amount of $526. Respondent made these determinations by reconstructing petitioner's income using the bank deposits method. In this regard, respondent analyzed the checking account and the savings account that petitioner maintained with Channelview Bank and concluded as follows:

Checking Account (no. 53-162984-9)

| Statement date | Net deposits | Less: transfers | Less: non-taxables | Net taxable |
|---|---|---|---|---|
| 1/14/91 | $1,265.00 | --- | [1] $665.00 | $600.00 |
| 2/14/91 | 935.00 | --- | --- | 935.00 |
| 3/15/91 | 1,645.60 | --- | [2] 135.10 | 1,510.50 |
| 4/14/91 | 2,053.00 | --- | --- | 2,053.00 |
| 5/14/91 | 1,865.00 | --- | --- | 1,865.00 |
| 6/14/91 | 480.00 | --- | --- | 480.00 |
| 7/14/91 | 1,250.00 | --- | --- | 1,250.00 |
| 8/14/91 | 1,363.00 | --- | --- | 1,363.00 |
| 9/15/91 | 1,040.00 | --- | --- | 1,040.00 |
| 10/14/91 | 1,163.50 | --- | --- | 1,163.50 |
| 11/14/91 | 1,800.00 | [3] $600.00 | --- | 1,200.00 |
| 12/15/91 | 670.00 | --- | --- | 670.00 |
| 1/14/92 | 722.00 | [3] 200.00 | [4] 312.00 | 210.00 |
| Total | | | | 14,340.00 |

[1] Deposits made in 1990.
[2] See supra note 3.
[3] From savings account (no. 30-561183-0).
[4] Deposits made in 1992 ($282); balance ($30)
    deemed to be a loan.

Savings Account (no. 30-561183-0)

| Statement date | Net deposits[1] | Less: transfers | Less: non-taxables | Net taxable |
|---|---|---|---|---|
| 4/01/91 | $440.57 | --- | --- | $440.57 |
| 7/01/91 | 1,641.54 | --- | --- | 1,641.54 |
| 10/01/91 | 1,064.61 | --- | --- | 1,064.61 |
| 12/31/91 | 309.35 | --- | --- | 309.35 |
| Total | | | | 3,456.07 |

[1] Inclusive of interest paid quarterly as follows:

| | |
|---|---|
| 4/01/91 | $165.57 |
| 7/01/91 | 152.54 |
| 10/01/91 | 166.61 |
| 12/31/91 | 141.35 |
| Total | 626.07 |

The documentary evidence introduced at trial by respondent, specifically the records maintained by Channelview Bank in

respect of petitioner's checking and savings accounts with that institution, corroborates respondent's determination of net deposits[5] and supports respondent's bank deposits analysis in general.

After analyzing petitioner's bank deposits, respondent proceeded with her determination of unreported income as follows:

```
(1) Unreported self-employment income
      net taxable deposits
            (a) checking account              $14,340.00
            (b) savings account
                  total deposits    3,456.07
                  less: interest     -626.07    2,830.00
                                               17,170.00
            less: reported gross receipts      -4,500.00    $12,670.00

(2) Unreported interest income
      total interest income                       626.07
      less: reported interest income            -100.00       526.07

   Total                                                    13,196.07
```

OPINION

We begin with a fundamental principle of tax litigation, namely, that, as a general rule, the Commissioner's determinations are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous. Rule 142(a); INDOPCO Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Welch v. Helvering, 290 U.S. 111, 115 (1933).

We think that the foregoing principle is applicable in the present case for two reasons. First, the record conclusively

_____

[5] Although respondent's analysis focuses on the "net deposits" to petitioner's bank accounts, the documentary evidence demonstrates that petitioner never received any cash back when he made deposits. Thus, there is no difference between gross deposits and net deposits.

demonstrates that in 1991 petitioner worked as a barber and received taxable income in that capacity. Cf. Portillo v. Commissioner, 932 F.2d 1128 (5th Cir. 1991); Senter v. Commissioner, T.C. Memo. 1995-311. Second, bank deposits are prima facie evidence of income. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Estate of Mason v. Commissioner, 64 T.C. 651, 656-657 (1975), affd. 566 F.2d 2 (6th Cir. 1977); see Price v. United States, 335 F.2d 671, 677 (5th Cir. 1964) ("The 'bank deposits' method assumes * * * that all money deposited in a taxpayer's bank account during a given period constitutes taxable income.") Accordingly, petitioner bears the burden of proving that respondent's determination of income based on the bank deposits method is erroneous. Clayton v. Commissioner, 102 T.C. 632, 645 (1994); DiLeo v. Commissioner, 96 T.C. 858, 868 (1991), affd. 959 F.2d 16 (2d Cir. 1992); see Calhoun v. United States, 591 F.2d 1243, 1245 (9th Cir. 1978) (taxpayer's burden to prove that unexplained bank deposits came from a nontaxable source).

We turn now to the three issues for decision.

Issue (1): Unreported Self-employment Income

Petitioner does not contest respondent's determination regarding the amount of net deposits to his bank accounts in 1991.[6] Rather, petitioner contends that what appear to be unexplained bank deposits are actually nontaxable reimbursements

---

[6] As previously stated, the documentary evidence introduced at trial corroborates respondent's determination of net deposits.

received by him from his sister Ms. Williams and his cousin Ms. Rawls.[7]  Petitioner's position herein is set forth in the Protest that petitioner filed with respondent during the administrative stage of this case:

> The taxpayer maintained credit cards and charge accounts during the years in question.  Members of the taxpayer's family who had no credit cards or charge accounts routinely made charges on these accounts. These family members gave the taxpayer cash to pay for their charges and that cash was deposited.[8]

Petitioner does not contend that he received "reimbursements" from any family member other than his sister Ms. Williams and his cousin Ms. Rawls.

Petitioner's "reimbursement" story is principally based on petitioner's testimony, as well as the testimony of his cousin Ms. Rawls.[9]  At trial, we had the opportunity to observe the demeanor of petitioner and Ms. Rawls and to evaluate their

---

[7] Petitioner does not contend that respondent failed to properly credit him for any gifts, inheritances, or loans. Further, petitioner does not contend that his father had any interest in petitioner's savings account.  See supra note 2.

[8] We note that petitioner's Protest was admitted into evidence solely for impeachment purposes.  We quote it here only because it represents the most succinct statement of petitioner's position at trial and on brief.  As the discussion in the text will shortly reveal, we reject petitioner's position based on our negative assessment of petitioner's credibility.

[9] Petitioner did not call his sister Ms. Williams to testify, nor did he explain why her testimony was not offered. Under the circumstances, we are entitled to assume that Ms. Williams' testimony would not have been favorable to petitioner's position.  See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

credibility. Petitioner's testimony lacked the ring of truth, and Ms. Rawls' testimony sounded rehearsed. In short, we do not find the testimony of petitioner and Ms. Rawls to be worthy of belief. Under these circumstances, we are not required to, and we generally do not, accept either petitioner's self-serving testimony or what we regard as Ms. Rawls' programmed testimony. See Tokarski v. Commissioner, supra; Hawkins v. Commissioner, T.C. Memo. 1993-517, affd. without published opinion 66 F.3d 325 (6th Cir. 1995).[10]

In view of our negative assessment of the credibility of petitioner and Ms. Rawls, we find it unnecessary to painstakingly dissect and analyze the record in this case. See Hawkins v. Commissioner, supra. Rather than immediately moving on to the next issue, however, we think it appropriate to make a few comments and observations in order to illustrate why, independent of our assessment of credibility, we find the record in this case to be deficient from petitioner's point of view.[11]

---

[10] In Hawkins v. Commissioner, T.C. Memo. 1993-517, affd. without published opinion 66 F.3d 325 (6th Cir. 1995), we stated as follows:

> As is customary in this Court, we have treated petitioners with respect and viewed their * * * story in an unbiased manner. Although petitioners' story is imaginative, we find it * * * unbelievable.

[11] As a preliminary matter, we note that statements made in briefs do not constitute evidence. Rule 143(b).

Petitioner contends that his sister and cousin had income but bad credit, whereas he had minimal income but good credit. Therefore, according to petitioner, he permitted his sister and cousin to trade on his credit and reimburse him in cash for expenditures made on their behalf.

Petitioner failed to prove the premise of his contention by introducing credit reports or other documentary evidence showing that his sister and cousin had bad credit. Petitioner likewise failed to prove that his sister was employed or had income in 1991. In any event, the record demonstrates that petitioner's credit cards and charge accounts were used only infrequently in 1991 and then only to make relatively modest purchases, with one exception. Thus, petitioner rarely used his American Express card, and he never had a monthly balance greater than $100. Moreover, petitioner made no charges to his Citibank MasterCard account, and he made but a single purchase (in the amount of $23.70) using his Discover card. In addition, petitioner made no charges to his account with Foley's, and he made only one charge (in the amount of $261) to his account with Metropolitan.

Regarding the latter purchase, a prospective customer with poor credit, including a history of repossessions, could probably have obtained credit from Metropolitan with a $130 downpayment. Thus, even if petitioner's sister or cousin had a bad credit history, there was no showing that she could not have handled the

purchase with Metropolitan without petitioner's alleged intervention, assuming that such transaction was for her benefit.

Petitioner did not use his account with McDuff's Appliances in 1991 other than to purchase a projection screen television that cost approximately $2,000. However, the record does not indicate that the purchase was made for other than petitioner's benefit. Interestingly, Ms. Rawls never mentioned this item when she testified. We think that the purchase of a $2,000 projection screen television would stick in one's mind, especially if one's income were $16,645.

Although it is true that petitioner carried over from 1990 an outstanding balance on certain of his accounts, namely, his Citibank MasterCard ($631.22), his Discover card ($447.26), and his account with Foley's ($589.49), the record does not disclose what goods or services had been charged to give rise to such balances.

It is also true that in September 1989 petitioner purchased several pieces of furniture and related hardware from Metropolitan for a cash price of $1,157 and that he financed this purchase. On brief, petitioner argues that respondent's determination of unexplained bank deposits should be reduced by $1,157 as a nontaxable reimbursement. Petitioner would have us ignore the terms of the retail installment contract that obligated him to make 18 payments of approximately $58.50 per month commencing November 1989. Therefore, if petitioner were as

creditworthy as he claims to be, petitioner would have made some 14 payments before 1991 even began, and the outstanding balance would have been no more than $235.

Also noteworthy is the fact that on the credit application for the September 1989 purchase, petitioner represented that he had been working as a barber/stylist for at least 1 year and 9 months. However, petitioner reported no barber income on his 1988 income tax return.

Moreover, on the credit application for not only the September 1989 purchase but also for the January 1991 purchase, petitioner represented that his weekly "take-home" pay for working as a barber/stylist was $350. "Take-home" pay of $350 per week for 50 weeks amounts to $17,500 for the year. Here it should be recalled that respondent's determination of petitioner's barber income was $17,170. It should also be recalled that respondent's determination was based strictly on an analysis of petitioner's bank accounts and therefore did not take into account the cash that petitioner pocketed and did not deposit.[12]

---

[12] Although we accept the possibility that petitioner's sister and cousin may have, on occasion, reimbursed petitioner for some purchase, see supra note 3, we do not think, and it has not been shown, that the aggregate amount of any such reimbursements exceeded the amount of petitioner's barber income that was pocketed and not deposited and, therefore, not included in respondent's bank deposits analysis.

We also fail to comprehend how petitioner could handle a $385 monthly car payment on his reported income. After all, 12 monthly payments of $385 equal $4,620, an amount in excess of petitioner's reported gross income for 1991. Even if, as alleged, petitioner's cousin helped service the loan by reimbursing petitioner $50 to $100 per month for her use of the vehicle, petitioner's yearly car payment would have ranged from $3,420 (i.e., 12 x ($385-$100)) to $4,020 (i.e., 12 x ($385-$50)). Any amount in this range would have represented a disproportionate percentage of petitioner's reported gross income for 1991.

We also take note of the fact that the vast majority of the deposits made to petitioner's bank accounts were made in cash and that petitioner's barber business was a cash business. Significantly, none of the checks deposited to petitioner's accounts were drawn by either petitioner's sister or his cousin. Although the record contains no details concerning the employment or income, if any, of petitioner's sister, the record does show that petitioner's cousin was employed by Methodist Hospital in Houston and received wages of $16,645 in 1991. Presumably petitioner's cousin was paid her wages by check. We fail to comprehend why, therefore, she would have "reimbursed" petitioner in cash, particularly given the fact that petitioner maintained bank accounts.

Also noteworthy is the fact that petitioner was placed on academic suspension following the spring semester of 1990 and did not return to the University of Houston until the fall semester of 1991. At that time he enrolled in only two courses for a total of 7 credits. Thus, petitioner's academic endeavors in 1991 would hardly have impeded his income-producing activity as a barber. This is especially evident from the fact that in 1989, when petitioner was enrolled in 4 courses for a total of 13 credits during the spring semester and 3 courses for a total of 10 credits during the fall semester, petitioner was capable of earning as a barber (according to his credit application with Metropolitan) "take-home" pay of $350 per week.

During the course of the examination, petitioner represented that he maintained a wall calendar at the barber shop that he used to keep track of appointments and to record income. He further represented that the current month of the calendar was not retained after month's end. At trial, petitioner denied making these representations. When confronted with his written Protest, which referred to an "appointment book",[13] petitioner responded as follows:

---

[13] The pertinent part of the Protest stated as follows:

The taxpayer maintained an appointment book for his customers and to list the income earned from his customers. The taxpayer then reported the income on his tax return.

That [i.e., the statement in the Protest] was basically overlooked.  It was not -- it did not happen that way.  My -- what I showed you [referring to petitioner's small, red, spiral notebook] is the way that it actually happened.  I just miscued that, because he [petitioner's representative at the examination level] handled most of the preparation of this [the Protest], because -- and then I okayed it, because he had the equipment to do this.  He had a computer.  I didn't have access to this type stuff.

So I just merely overlooked that.  It wasn't that that is what happened.  I didn't pick that up in reading and proofreading.  Okay, and he, himself, thought that this was considered my appointment book, as close as to what I was going to have to one.  So that is why this was even referenced to that, and even in the same line, he comes right behind it, and said, the book for customers and to list the income earned for -- from his customers.

That is the way he took that.  That is pretty much the explanation on that misconstrue -- misconstrusion, I should say.[14]

Petitioner contends that he maintained an accurate and contemporaneous record of his income in his small, red, spiral notebook.  However, we are not convinced that this notebook was contemporaneously maintained; we are also not convinced that the entries in the notebook accurately reflect petitioner's barber income.

First, we find it odd that one would attempt to recreate a calendar by hand in a notebook when printed calendars are so readily and inexpensively obtainable.

---

[14] Petitioner's examination-level representative was present throughout the trial of this case; however, he did not testify.

Second, we think it remarkable that petitioner's notebook reflects that petitioner worked Tuesdays, Wednesdays, and Fridays, and only Tuesdays, Wednesdays, and Fridays, throughout the year.  After all, petitioner was not attending the University of Houston during the spring semester of 1991 and he was only enrolled in two classes during the fall semester.  Nothing in the record suggests that petitioner could not have worked, either regularly or occasionally, on Thursdays and/or Saturdays.[15]  Yet the manner in which petitioner structured his notebook, with the rigid columns for only Tuesdays, Wednesdays, and Fridays, indicates that no possibility whatsoever existed that petitioner might work, even just once, on a Thursday or Saturday.

Third, petitioner's notebook indicates that petitioner worked on the first Tuesday of January 1991.  However, the first Tuesday of January 1991 was New Year's Day.  The barber shop was closed on that date and petitioner did not work.

Fourth, petitioner's notebook misdated the first Tuesday of January 1991 as January 2.  Petitioner's notebook also misdated the first Tuesday-Friday period as January 2-5, rather than January 1-4, and similarly misdated the Tuesday-Friday periods for the next 3 weeks of the month.

---

[15] It should be recalled that the barber shop had 4 barber chairs and that only petitioner, his father, and a cousin worked there.  Thus, there was always room for petitioner to work.

Fifth, the monthly totals in petitioner's notebook amount to $4,584.  On his return, however, petitioner reported gross receipts in an even amount of $4,500.

Finally, the general appearance of petitioner's notebook, including the use of multicolored inks and pencil, suggests that the notebook is not a trustworthy document.

In view of the foregoing, we sustain respondent's determination and hold that petitioner failed to report self-employment income in the amount of $12,670.

Issue (2): Unreported Interest Income

The record conclusively demonstrates that petitioner's savings account with Channelview Bank was credited with interest on the following dates and in the following amounts:

- NEXTRECORD -

| Posting date | Amount |
|---|---|
| 4/01/91 | $165.57 |
| 7/01/91 | 152.54 |
| 10/01/91 | 166.61 |
| 12/31/91 | 141.35 |
| Total | 626.07 |

The record also demonstrates that petitioner only reported $100 of interest income on his 1991 income tax return. Accordingly, we sustain respondent's determination and hold that petitioner failed to report interest income in the amount of $526.

Issue (3): Accuracy-related Penalty

Section 6662(a) and (b)(1) provides that if any portion of an underpayment of tax is attributable to negligence or disregard of rules or regulations, then there shall be added to the tax an amount equal to 20 percent of the amount of the underpayment that is so attributable.[16] The term "negligence" includes any failure to make a reasonable attempt to comply with the statute, and the term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c).

By virtue of section 6664(c)(1), the accuracy-related penalty is not imposed with respect to any portion of an

---

[16] The accuracy-related penalty may also be applicable if there is an underpayment of tax that is attributable to a substantial understatement of income tax. Sec. 6662(a), (d). Respondent conceded that there is no underpayment of tax in the present case that is attributable to a substantial understatement as defined by sec. 6662(d)(1)(A) and (2)(A).

underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion. Whether a taxpayer acted in good faith depends upon the pertinent facts and circumstances. Estate of Monroe v. Commissioner, 104 T.C. 352, 366 (1995); sec. 1.6664-4(b)(1), Income Tax Regs. The most important factor is the extent of the taxpayer's effort to assess his or her proper tax liability. Beard v. Commissioner, T.C. Memo. 1995-41; sec. 1.6664-4(b)(1), Income Tax Regs.

The burden of proving that the accuracy-related penalty should not be imposed rests with the taxpayer. Rule 142(a); INDOPCO Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Petitioner contends that he is not liable for the accuracy-related penalty because he maintained accurate records of his income and because he accurately reported his income. We disagree.

Insofar as petitioner's unreported interest income is concerned, the record demonstrates that petitioner received interest in the amount of $626.07 from Channelview Bank in respect of his savings account with that institution. However, on his 1991 income tax return, petitioner only reported $100 of interest, an amount that appears to have been estimated and that bears no relation to the amount of interest that was earned. Thus, it cannot be said that petitioner maintained accurate

records of his interest income or that he accurately reported such income.

Insofar as petitioner's unreported self-employment income is concerned, we have already commented on petitioner's small, red, spiral notebook and sustained respondent's determination that petitioner failed to report $12,670 of self-employment income. Thus, it cannot be said that petitioner maintained accurate records of his self-employment income or that he accurately reported such income.

Finally, the record does not demonstrate that petitioner made a good faith effort to assess his proper tax liability for 1991.

In view of the foregoing, we sustain respondent's determination and hold that petitioner is liable for the accuracy-related penalty under section 6662(a).

Conclusion

To reflect the foregoing,

<u>Decision will be entered for respondent.</u>